## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA
## OKLAHOMA CITY, OKLAHOMA

KENNETH STEVEN POPE,⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀acting on behalf of infant children,⠀)
⠀T.H.L-P and J.R.L.-P⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀Civil Case No.:⠀⠀CIV-19-1122-PRW
⠀⠀⠀⠀⠀⠀⠀Petitioner,⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
v.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
LAUREN ELAINE LUNDAY,⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀Respondent.⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)

## VERIFIED PETITION FOR RETURN OF THE CHILDREN TO BRAZIL

## THE CONVENTION ON THE CIVIL ASPECTS OF INTERNATIONAL CHILD ABDUCTION, DONE AT THE HAGUE ON OCTOBER 25, 1980 AND THE INTERNATIONAL CHILD ABDUCTION REMEDIES ACT (22 USC 9001, ET SEQ.)

### PREAMBLE

1.⠀⠀⠀Petitioner, KENNETH STEVEN POPE, brings this Petition pursuant

to the Convention on the Civil Aspects of International Child Abduction, done at the

Hague on October 25, 1980 (hereinafter referred to as the "Hague Convention"), and

1

the International Child Abduction Remedies Act, (hereinafter referred to as "ICARA"), 22 U.S.C. § 9001 *et. seq.* (1995).

2.      The Convention became effective in the United States on July 1, 1988, and Brazil became a contracting state within the meaning of Article I of the Convention on or about December 1, 2003. For the convenience of the Court, copies of the Convention and ICARA are attached as **Exhibits 1 and 2**, respectively.

3.      The objectives of the Convention are: (1) to secure the prompt return of children wrongfully retained in any Contracting State; and (2) to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States. *See* Hague Convention, Article 1(a), and 1(b).

4.      The Convention applies to cases in which one parent wrongfully removes or retains his or her child, who is under the age of sixteen (16) years in breach of the other parent's custodial rights, which were being exercised at the time of the wrongful removal or retention of the child. For the 1980 Hague Convention to apply, the child must have been habitually resident in a contracting State prior to the removal or retention and end up in another contracting State of the Hague Convention. *See* Hague Convention, Art. 3.

5.      The Convention confers standing to persons whose "rights relating to the care of the person of the child, and in particular, the right to determine the child's

place of residence" have been breached by the wrongful removal or wrongful retention. *See* Hague Convention, Art. 5(a).

6. This case involves Respondent's wrongful retention of the parties' twin sons whose initials are T.H. L.-P, and J.R.L.-P (hereinafter referred to as "the Children"), born on November 26, 2019, now 5 days old, from São Paulo, Brazil to the United States in violation of Petitioner's custody rights validly exercised at all times material hereto and exercised now but for the wrongful retention.

7. Petitioner respectfully requests that pursuant to Articles 1(a) and 12 of the Convention, this Court order that the Children be returned to Brazil, the children's habitual residence at the time of wrongful retention and their habitual residence as established by the joint decision of the parties pursuant to Articles 1631 and 1634 of the Brazilian Civil Code. **Ex. 3**

## JURISDICTION

8. This Court has jurisdiction over this case pursuant to ICARA, 22 U.S.C. § 9003(a) and 28 U.S.C. § 1331 (Federal Question Jurisdiction).

9. Venue is proper pursuant to 22 U.S.C. § 9003 and 28 U.S.C. § 1391(b) because, upon information and belief, the children and Respondent are located in this Western District in Oklahoma City, Oklahoma just prior to and subsequent to the birth of the Children.

3

## HISTORY OF THE CASE AND STATUS OF PETITIONER, RESPONDENT AND CHILDREN

10.    Petitioner and Respondent met in 2003 at the University of Oklahoma, while both were college students and where Respondent was dating a friend of Petitioner.  The Petitioner and Respondent fast became good friends and eventually began a romantic relationship in 2006 in Oklahoma.  The couple split up in late 2006 when Petitioner moved to Houston, Texas to attend medical school. The parties quickly became friendly again in 2007, when Petitioner returned to Oklahoma for further graduate studies in an MBA program.  Thereafter, the Petitioner moved to Brazil and the Respondent moved to Florida, both relocating for purposes of continuing their individual careers. Petitioner founded and manages a private equity firm based and incorporated in Brazil, and Respondent is an oral and maxillo facial surgeon, having completed their graduate work at Oklahoma City University and at the University of Oklahoma, respectively.

11.    The parties renewed their romantic relationship in 2014, when Respondent contacted the Petitioner by telephoning him in Brazil on June 9, 2014. Respondent had just broken off an engagement to another man.

12.    Thereafter, the parties continued their intimate, loving relationship when Respondent flew to Brazil to visit Petitioner in November of 2014. Respondent continued to be romantically involved with the Petitioner and traveled often to see

4

him in Brazil, as well as traveled with him to the United States and other countries such as Colombia, Argentina, Chile, and also traveled extensively within Brazil.

13.     Over the New Year's holiday 2016 while in Brazil, the couple discussed Respondent relocating permanently to Brazil from Florida, and plans were made to accomplish the move, get engaged and eventually marry and begin their life together as Husband and Wife.

14.     Respondent immediately began the endeavor to become licensed to practice her surgical, dental specialty in São Paulo, Brazil and Petitioner encouraged and assisted Respondent in pursuing marketing efforts in that regard.

15.     The two became engaged in Brazil on August 6, 2017 during a 10-day trip for Respondent to visit the Petitioner, and the couple immediately began dreaming of their plan to create and have a large family and make Brazil their home.

16.     Respondent also took the following actions in order to leave the United States  to permanently relocate to Brazil:

    a.     She sold furniture items and terminated the lease agreement she had in Oklahoma and returned the keys to the unit in May 2018;

    b.     She quit her employment as a dental surgeon in Oklahoma in May 2018;

    c.     She retained moving services and had her personal belongings moved to Brazil in June 2018; and

5

   d.  She made formal arrangements and prepared the paperwork to move her pet cat to Brazil.

 17.  Respondent did then permanently relocate to São Paulo on July 7, 2018.

**Ex. 4**

 18.  After moving to Brazil on July 7, 2018, Respondent took further actions to establish her permanent residency in São Paulo. Specifically:

   a.  She began the process to obtain licensure in Brazil as a dental surgeon;

   b.  She began the marketing process by making professional contact within the dental industry in São Paulo;

   c.  She began the process to obtain and did obtain the Brazilian equivalent of a Social Security Card;

   d.  She enrolled in Portuguese language lessons;

   e.  She retained the services of a physical fitness trainer;

   f.  She procured a Brazilian cell phone;

   g.  She contracted a health insurance from Notre Dame Brazil;

   h.  She was given a credit card which was linked to the couple's joint bank account  **Comp. Ex. 5**

19.   Respondent executed a Power of Attorney for the purposes of obtaining her dental license in Brazil, declaring her permanent residence and domicile to be São Paulo, Brazil, which was subsequently reaffirmed on July 25, 2019.   **Ex. 6**

20.   After several months of planning, the couple celebrated their nuptials in Tulum, Mexico, where approximately 130 friends and family gathered for the November 17, 2018 ceremony.   The parties and their guests enjoyed three days of festivities thereafter, which continued until the parties returned to Brazil on November 25, 2018, after the parties had joined Respondent's family for Thanksgiving in the United States.

21.   To expedite Brazil's recognition of the Mexican wedding, the parties executed a Deed of Declaration of Stable Union on December 10, 2018, which established the parties as family for all purposes under Brazilian law, in equal footing and with all rights and duties as that of a married couple. **Ex. 7**

22.   The parties departed from their home in Brazil to celebrate their honeymoon in Africa, and then returned to their home in Brazil afterwards. They became joyfully aware that the Respondent was pregnant in March of 2019, having conceived the children on or about March 16, 2019 at their home in Brazil. Petitioner immediately began participating in all aspects of the pregnancy, including but not limited to assisting Respondent with locating appropriate physicians and attending all of the prenatal appointments. **Ex. 8**

7

23.    The couple began planning for their new family by purchasing and renovating their new home in São Paulo, Brazil, to accommodate the larger family. In addition, when the couple found out they were having twin boys, the parties purchased in July 2019, a second, new apartment adjacent to the unit they previously purchased, to accommodate friends and family members when visiting the couple and their new babies in their home in Brazil. **Ex. 9**

24.    Petitioner is domiciled in Brazil and currently resides in São Paulo, Brazil, having been so domiciled for more than ten years since August 18, 2008. On January 14, 2009, Petitioner obtained and has continued to hold a permanent resident visa, as is required for any foreigner working in the country. Because he is a foreigner, Petitioner will lose his resident status under Brazilian law if he stays more than 181 days out of Brazil, which would entail him being forbidden from acting as the chief executive officer of his business in Brazil. Petitioner's private equity firm was founded and still is located in São Paulo, Brazil, where it employs more than 2500 persons from the local economy through its development partnership with international companies in the food and beverage retail industry.

25.    Respondent is a resident of and is domiciled in Brazil, although she is now currently concealing her whereabouts and staying at an undisclosed location in Oklahoma with the parties' 5 day old twins.

8

26.    The parties have two minor Children of the relationship, whose initials are T.H.L-P and J.R.L.-P, twin sons, (DOB: 11/26/2019) who were born at The Children's Hospital in Oklahoma City, Oklahoma and who are being wrongfully retained in Oklahoma.  Copies of the birth certificates identifying Petitioner as the father of the children is believed to be available at The Children's Hospital at Oklahoma University Medical Center in Oklahoma City, Oklahoma.

27.    On or about April 15, 2019, Respondent had informed Petitioner that she was taking a few weeks trip to the United States in July 2019 to see her mother, attend a party, and to attend a professional dental conference in Boston, Massachusetts.  Knowing the twins were expected to be born in Brazil in December of 2019, and Respondent having advised that the trip would extend only for a few weeks, Petitioner at no time had reason to suspect that Respondent was being untruthful toward him regarding her intentions in traveling to the United States.

**Ex. 10**

28.    On the date of Respondent's scheduled departure to the United States, July 29, 2019, the Respondent was approximately 19-20 weeks pregnant with their twins. The parties met for lunch at a favorite spot in São Paulo.  Petitioner said "so long for a few weeks" to the Respondent, eagerly awaiting her return in several weeks to prepare for the birth of their twin sons in Brazil as planned for by the couple.

29.     Later that day, Respondent telephoned Petitioner from the airplane prior to take off to bid him farewell once again.  Only at that time did Respondent first divulge to Petitioner that she had also taken their pet cat with her on the airplane.

30.     Respondent failed to contact Petitioner when Respondent landed in the United States other than to state that she had "landed safely."  For several days thereafter, Respondent refused to answer phone calls from the Petitioner and refused to disclose to him where she and their unborn twins were located.  Petitioner was unable to travel to the United States to attempt to locate Respondent due to a previously scheduled medical surgery which was necessary for Petitioner to have resolved on August 10, 2019.

31.     Subsequent to Respondent's travel to the United States, Petitioner had sent her messages asking her to return his calls on August 6, 13, 16, 17, 18, 20, 23, 24, 25, 26, and 27, and on September 4, 8, 9, 15 and 18.  On these occasions, Respondent behaved abnormally, was unsympathetic to Petitioner's concerns about her behavior and whereabouts, and when Respondent did acknowledge him, she advised only that she was "unable to speak" at the time. **Ex. 11**

32.     Petitioner ultimately became aware that the Respondent had requested the return to her of the original documents she had provided for dental licensing to the local authority in Brazil in charge of processing the licensing application for the Respondent. The Respondent arranged for certified copies of the originals to be

10

made and left them with the local authority in Brazil, in order to keep the validation process running, prior to receiving back her original documents. The lawyers and consultants paid by Petitioner to validate the Respondent's license in Brazil continue to work on the process. The consultants have never been instructed by Respondent, who had until July been directly interacting with them, to stop the process. **Ex. 12**

33.    Petitioner became aware on September 18, 2019, that the Respondent had not traveled to Boston for the conference despite Petitioner having paid for all of the expenses for same, including registration and hotel, and a round trip airline ticket for the Respondent's attendance at the conference. **Ex. 13**

34.    Not knowing what to do and unable to reach his Wife for more than one month, Petitioner contacted his mother-in-law on September 18, 2019. His mother-in-law failed to answer the phone nor did she return his phone call, voicemail nor did she return Petitioner's WhatsApp messages. **Ex. 14**

35.    On September 19, 2019, nearly two months after leaving Brazil, Respondent telephoned the Petitioner. It was only during that first voice conversation since deceptively leaving Brazil that Respondent notified Petitioner that she was unhappy in the marital relationship. Petitioner's attempts to determine when Respondent would return with their unborn children to Brazil was unsuccessful.

11

36.    Between July 29, 2019 and November 26, 2019, Petitioner had only a few telephone call voice communications with Respondent and he was uncertain of the whereabouts of the Respondent and their unborn twins.   When asked, Respondent had limited herself to evasive answers.   Given her family ties and the expenses incurred in her credit card (which is currently linked to a bank account in Brazil), Petitioner verily believed it was in Oklahoma.

37.    Between July 29, 2019 and November 26, 2019, Respondent undertook a systematic denigration of Petitioner by removing his identity as being her Husband from her social media accounts. **Ex. 15.** Respondent also arranged and attended her own baby shower in Oklahoma.   Respondent created invitations to the shower, however, she did not use her married name on the invitation, and opted instead to use her maiden name. Respondent also failed to mention Petitioner's name as the Father on the invitations and in the online registries for gifts for their twin sons. Attempts by Petitioner to discuss naming their boys were rebuffed by Respondent. Scheduled times for such calls went unanswered by Respondent, who refused also to provide the date for the induction of the Cesarean section to Petitioner. **Ex. 16**

38.    On November 26, 2019, Petitioner was notified by third parties that the Respondent was in labor in Oklahoma City, Oklahoma, and that the twins were being delivered by Cesarean section on that date.

39.    Petitioner immediately made arrangements to travel from the couple's home in Brazil to participate in the occasion of the birth of his sons, albeit away from the intended place of birth in Brazil.

40.    Petitioner arrived to the Children's Hospital in Oklahoma City, OK early in the morning of November 27, 2019. On November 27, 2019 and on November 28, 2019, the Petitioner held his sons and was permitted restricted access in the hospital to the babies, however, Petitioner's attempts to name the children in agreement with Respondent were unsuccessful for at least three days as outlined below.

41.    On November 29, 2019, upon arrival to the hospital, Petitioner was advised by nurses at the hospital that Respondent was denying that the couple was married; Respondent was denying the Petitioner access to the twin boys; Respondent was denying Petitioner a hospital arm band, which would permit him unfettered access to his sons; and Respondent was refusing to see Petitioner nor communicate with him concerning the naming of the boys.

42.    Petitioner spent approximately 6 hours waiting on November 29, 2019, to receive "permission" to hold his sons. Such permission continued to be withheld by Respondent who also refused to see Petitioner or participate in naming the boys.

43.    Upon communication with undersigned counsel, Petitioner filed a formal complaint with the hospital. After several more hours of waiting and having to be interviewed by a hospital social worker, Petitioner was finally able to hold his sons, but only in the presence of the social worker. He was "permitted" this access and contact for approximately one hour and then Petitioner was asked to leave.

44.    Petitioner was subsequently successful in participating in naming his sons. However, the Respondent actively misrepresented the discharge date of the twins, and she used additional deception to remove the boys from the hospital to an undisclosed location without the Petitioner's knowledge nor consent.

45.    Specifically, on the morning of November 30, 2019, one of the boys EKG results indicated an irregular heartbeat, and it was suggested to Petitioner by Respondent that the boys might not be discharged that day. Later that morning the pediatric cardiologists cleared the irregular heartbeat issue but did not update the Petitioner on the status of or timeline for discharge from the hospital. At approximately 1PM CST on November 30th, the mother in law left the room briefly, upon her return she asked that the Petitioner and the Petitioner´s mother leave the hospital in order to allow Lauren and the boys to rest. The Petitioner then confirmed directly with the Respondent if she wanted the Petitioner and the Petitioner´s mother to leave the hospital for a few hours. The Respondent confirmed they should leave the hospital to allow her and the boys to get some additional rest.  Respondent

14

advised Petitioner that he should return to the hospital any time after 4 p.m. to share some contact time with their twin sons. Petitioner left to have a small lunch, and when he returned after 4 p.m. to share some contact time with their twin sons as directed by the Respondent, he discovered that Respondent had been discharged from the hospital, taking the boys with her, and leaving no address for Petitioner to locate his sons nor to see them. Despite repeated attempts made by the Petitioner to contact the Respondent and the Respondent´s mother by phone and Whatsapp messenger, as soon as he learned of their discharge from the hospital and the hours that followed, to locate the address of the Respondent and their sons, all attempts for contact were ignored by the Respondent and the Respondent´s mother.  At the time of this petition, Respondent refuses access and contact to the Petitioner with his sons and she continues to affirmatively conceal their location. Attempts to locate the address of the Respondent and the sons have been unsuccessful.

## DECLARATION ESTABLISHING BRAZIL AS THE HABITUAL RESIDENCE OF THE CHILDREN

46.   The residence of the minor Children for the last five (5) years is as follows:  **NOT APPLICABLE**

| Children's Names: | |
|---|---|
| Place of Birth: | |
| Birth Date: | |

15

| | |
|---|---|
| **Gender:** | |
| **Period of Residence:** | |
| **Number of Days/Month/Years:** | |
| **Addresses:** | |
| | |
| | |
| | |
| **Person Child Lived With:** | |
| | |
| **Period of Temporary Residency:** | |
| **Address:** | |
| **Person Child Lived With:** | |
| **Period of Wrongful Retention:** | |
| **Number of Days/Months/Years:** | |
| **Address:** | |

47.     The Children remain dependents for all purposes in Brazil, including, but not limited to, the financial support being paid by their father, the Petitioner, which includes their health insurance in Brazil **Ex. 17**. In that regard, Petitioner initiated and filed a proper child support proceeding to the benefit of the children on October 14, 2019, before the 10th Lower Family and Succession Court in the Civil District of the São Paulo State Capital, case no. 1102638-27.2019.8.26.0100. The relief sought from the Brazilian Court was as follows: (i) set child support during pregnancy at the amount of R$ 20 thousand, until the babies are born; (ii) have Respondent send (a) updates, at least twice every week, of the development of the pregnancy and about the babies' health; (b) the result of the examinations performed in the last month and all of the examinations that will be performed until the end of the pregnancy; (c) information about the planning of the delivery allowing time for

16

Petitioner to attend; (iii) be the authority of Brazilian law recognized to decide on Petitioner's rights and duties in connection with their children both while still unborn **and after their birth**. This action is unrelated to a proceeding for dissolution of the marriage. The Brazilian Court has acknowledged authority to rule on the matter and granted, *inaudita altera pars*, a preliminary injunction determining that Respondent provide all the requested information to Petitioner under penalty of R$ 5,000 (roughly $ 1,250). The Brazilian Court has also determined that any expenses incurred by Respondent on her Brazilian credit card (which, as mentioned above, is linked to the Petitioner's bank account in Brazil) is considered child support paid by Petitioner to the unborn children, in compliance with his duties under Brazilian law. **Ex. 18.**

48. Further, unborn children in Brazil have certain rights bestowed upon them pursuant to Brazilian law. One such right is to child support, pursuant to Law 11.804/08. Other rights granted to unborn children in Brazil are: (i) to have the father's presence; (ii) to receive assistance from their parents; (iii) to receive care from their parents; (iv) to have their paternity recognized even if born out of wedlock; (v) to have a guardian appointed to ensure their interests; (vi) to receive donation from their father; (vii) to be contemplated in their father's will, and thus be beneficiaries of a legacy or inheritance.

49.   At all times relevant hereto, Petitioner has maintained health insurance for the Respondent. At all times relevant hereto, Respondent has had the use of a Brazilian credit card from Santander Bank, which she has been utilizing since July 2018. This credit card, in the names of both of the parties, is used to pay expenses on behalf of Respondent and the unborn twins. Petitioner, the guarantor for the credit card, continues to pay the credit card on a monthly basis. **Comp. Ex. 19**

50.   Petitioner does not know of any person or institution not a party to the proceedings who has physical custody of the Children or claims to have rights of parental responsibilities or legal custody or physical custody of, or visitation or parenting time with the Children.

**WRONGFUL RETENTION OF CHILDREN BY RESPONDENT**

51.   A removal or retention of a child is wrongful under Article 3 of the Hague Convention if: (a) the removal or retention is in breach of *custody rights* attributed to a person, institution, or other body, either jointly or alone, under the law of the state in which the child was habitually resident immediately before the removal or retention; and (b) at the time of the removal or retention, those custody rights *were actually exercised*, or would have been exercised, but for the removal or retention of the child. *See* Hague Convention, Arts. 3 and 5.

52.    "Custody rights" under the Hague Convention are defined to include "rights relating to the care of the person of the child, and in particular, *the right to determine the child's place of residence.*" *See* Hague Convention, Art. 5(a).

53.    The Children's country of habitual residence, as described in Article 3 of the Hague Convention, is Brazil, which is where the Children resided in utero with the parties in the family home prior to the Respondent traveling by way of her deception to the United States. More importantly, Brazil was the stable habitual residence of the married parents as well as the intended residence of the children at birth. It follows that, under the Hague Convention, Brazil was the habitual residence of the children at birth and continues to be so during their wrongful retention in Oklahoma since their birth on November 26, 2019. The newly born children can only be deemed to have a habitual residence at the jointly agreed place of residence of the family, which was Brazil at the time the Respondent left the country when the twins were approximately 19-20 weeks old in utero. Put another way, the newborns cannot acquire a habitual residence in a country they are simply born in because of Respondent's unilateral, deceptive actions. Petitioner notes also that no dissolution of marriage proceedings or any other proceedings concerning the family was initiated by Respondent prior to leaving Brazil nor since she left Brazil.

54.    Petitioner has a right of custody of the Children within the meaning of Articles 3 and 5 of the Convention and pursuant to Brazilian law, which provides

that, both parents shall, regardless of their marital status, fully exercise the parental power, which, in relation to children, consists of:

I.    providing for their upbringing and education;

II.    exercising sole or joint custody pursuant to article 1584;

III.    granting or denying consent for them to get married;

IV.    granting or denying consent for them to travel abroad;

V.    granting or denying consent for them to change their permanent residence to another municipality;

VI.    appointing them a guardian by will or valid document, if the other parent either does not survive or, if alive, is unable to exercise parental power;

VII.    representing them in and out of court up to 16 years of age, in the acts inherent to civil life, and assisting them, after this age, in the acts they are a party to, by proving consent to them;

VIII.    claiming them from those holding them unlawfully; and,

IX.    demanding from them obedience, respect and services that suit their age and condition. See Article 1634, Brazilian Civil Code.

**Ex. 20**

55.    It is worth noting that, under Brazilian law, custody is exercised by the father and the mother on an equal basis. See Article 1631, Brazilian Civil Code, and

Article 22, sole paragraph, of Law 8.069/1990 (hereinafter referred to as the "Brazilian Youth and Children Act"). Brazilian law even provides that parents request a court decision to settle any matters the parents alone are unable to resolve. See Article 1631, sole paragraph, Brazilian Civil Code.

56.     Unilateral exercise of custodial rights is exceptional, and only allowed when one of the parents is dead, incapacitated, in absence, agrees with the unilateral custodial rights, or has had his or her custodial rights suspended or terminated by court order, after due process is observed.   None of these exceptions apply to this case. Petitioner is alive, capable and, until the Children were deceptively taken from his company, present at all times during the pregnancy.  Petitioner has taken all measures to assure his parental rights from the moment it became obvious to Petitioner that Respondent was unilaterally intending not to return to Brazil after her "few weeks trip" to the United States for feigned purposes. No court proceeding has been initiated, to the best of Petitioner's knowledge, seeking to suspend or terminate his parental rights, for which there is no basis, as Petitioner has equal custodial rights as to his sons pursuant to Brazilian law as outlined above and under the principles embodied within the Hague Convention.

57.     Respondent has denied Petitioner these rights of custody pursuant to Brazilian law by wrongfully retaining them in the United States.

58.    It is beyond any question that, had the twins been born in Brazil as jointly decided by the parties, the Respondent would not have been able lawfully to leave the jurisdiction of Brazil unilaterally with the twins after their birth, and a fortiori to retain them abroad, without either Petitioner's permission or an order of the Court. See Articles 83, 84 and 85 of the Brazilian Youth and Children Act. **Ex. 21**

59.    Upon information and belief, the Children are presently located within this Court's jurisdiction, however, at the time of filing the Respondent is actively concealing the children from the Petitioner.

60.    The Children are now 5 days old, having been authorized for discharge from hospital less than 48 hours prior to the signing of this Verified Petition. The Hague Convention applies to children under sixteen (16) years of age and thus applies to both of the Children.

61.    This Petition is filed less than one year from Respondent's wrongful retention of the Children.   Petitioner has never consented or acquiesced to Respondent's unilateral change to the habitual residence of the children, which can only be Brazil.  The parties at all times intended, prepared for and planned for the children to be born and raised at the site of the family home, which is São Paulo, situated in the contracting State of Brazil.

## PROVISIONAL REMEDIES

62.     Pending further hearing in this Court, it is requested that this Court issue an immediate order prohibiting the removal of the Children from the jurisdiction of this Court, ordering that the Respondent cease her active concealment of the twins from the Petitioner, and taking into safe-keeping all of the Children's travel documents, including any passports, and setting an expedited hearing on the Petition for Return of the Children to Brazil.

## NOTICE OF HEARING

63.     Pursuant to 22 U.S.C. § 9003(c), Respondent shall be given notice pursuant to the laws of Oklahoma regarding hearing on this Verified Petition. However, Petitioner notes that Respondent has actively concealed herself and the Children from the Petitioner, and their specific whereabouts within this jurisdiction is currently unknown, despite repeated requests for that information by the Petitioner.

## ATTORNEY'S FEES AND COSTS

64.     To date, Petitioner has incurred attorneys' fees and costs as a result of the wrongful retention of the Children by Respondent.

65.     Petitioner respectfully requests that this Court award him all attorney fees and costs, including transportation costs, incurred to date as required by 22 U.S.C. § 9007.

66.     Petitioner will submit a copy of all expenditures as soon as practicable and possible and will amend these costs, from time to time, according to proof and in light of further expenditure required because of this wrongful retention.

## **RELIEF REQUESTED**

WHEREFORE, Petitioner requests the following relief:

A.     Schedule a hearing on the Verified Petition and an order that Respondent show cause at this hearing why the Children should not be returned to Brazil and why such other relief requested in the Verified Petition should not be granted;

B.     Issue an order that Respondent surrender any and all of the passports of the Children and/or travel documents.

C.     Issue an order that Respondent cease her active concealment of the twins from the Petitioner.

D.     Issue an order pursuant to 22 U.S.C. § 9004(a), prohibiting Respondent from removing the Children from the jurisdiction during these proceedings.

E.     Issue an order following the hearing, directing that the Children shall be returned to their habitual residence of Brazil, pursuant to Article 12 of the Convention.

F.     Issue an order following the hearing, directing that the Children shall be returned to the place where both parties with equal custodial rights and equal

rights to determine the place of residence of the children did so fix and determine the children's place of residence to be Brazil, pursuant to Article 5 of the Convention. That place of return is São Paulo, Brazil, as previously found to be the domicile and residence of both of the Petitioner and Respondent pursuant to the order entered by the Brazilian Court on November 13, 2019. **Ex. 17**

G.   Issue an order directing Respondent to pay Petitioner for all costs and fees incurred to date by reason of the Children's wrongful retention pursuant to 22 U.S.C. § 9007; and

H.   Granting such other and further relief as this Court may deem appropriate.

Dated: December 2, 2019.

Robert D. Arenstein, Esq.
Florida Bar Number: 267368
295 Madison Ave. Fl 16
New York, NY 10017-4435
(212) 679- 3999
Co-counsel for Petitioner
arensteinlaw@aol.com
"Pending Admission"

Carmen R. Gillett, Esq.
Florida Bar Number:  375446
Carmen R. Gillett, PLLC
1845 Morrill Street
Sarasota, FL 34236
(941) 366-9826
Co-counsel for Petitioner
cgillett@carmenrgillett.com

# **VERIFICATION**

I, _Kenneth Steven Pope_ , declare under penalty of perjury under the laws of the United States of America that the foregoing Petition is true and correct.

Executed on _December 2nd_ , 2019.

_____,
Petitioner