IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH STEVEN POPE, acting on behalf of infant children, T.H.L-P and J.R.L-P, | ) ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) ) | Case No. CIV-19-01122-PRW |
| LAUREN ELAINE LUNDAY, | ) ) | |
| Respondent. | ) ) | |

## ORDER

Petitioner Kenneth Pope, an American permanently residing in Brazil, filed a Verified Petition (Dkt. 1) in this Court on December 2, 2019, seeking a court order requiring that his estranged wife, Respondent Lauren Lunday, "return" their newborn twin children to Brazil.[1] Pope makes this request pursuant to the International Child Abduction Remedies Act, 22 U.S.C. §§ 9001–9011 *et seq.*, claiming that the newborns are being wrongfully retained in the United States by Lunday—i.e., that this is a case of "International Child Abduction."[2]

Pope first asked the Court to issue a temporary restraining order (TRO) without notice to Lunday, directing Lunday to—among other things—remain in the Western

---

[1] Pet'r's Mem. of Law (Dkt. 15). "Return" is a bit of a misnomer because the children have never been to Brazil.

[2] *See id.* at 13.

1

District of Oklahoma pending resolution of this case.³ The Court set a hearing to determine whether proceeding without notice to Lunday was appropriate under Fed. R. Civ. P. 65(b), but just prior to that hearing, the Court was informed that the parties had reached an agreement with respect to a TRO. Accordingly, Lunday appeared through counsel at the hearing and agreed to entry of a TRO requiring that the newborns remain in the Western District of Oklahoma pending the Court's resolution of Pope's petition.

Pope's petition claims that the International Child Abduction Remedies Act applies to this matter because "the Children resided in utero with the parties in the family home [in Brazil] prior to the Respondent traveling by way of her deception to the United States," that "Brazil was the habitual residence of the children at birth," and that by keeping the children in Oklahoma, Lunday is thus "wrongfully retaining" the children away from their place of "habitual residence" in Brazil.⁴

The petition acknowledges, however, that (1) Lunday left Brazil long before the children were born (at 19-20 weeks in the pregnancy),⁵ (2) the children were born in the United States and have not spent a moment of their lives in Brazil,⁶ and (3) are currently

---

³ Pet'r's Emergency Mot. for TRO (Dkt. 4) at 6.

⁴ Pet'r's Verified Pet. (Dkt. 1) ¶¶ 53, 57, at 19, 21. For the sake of clarity, the Court cites pleadings and exhibits according to the CM/ECF page numbers appearing at the top of the page next to the file-stamp, rather than according to the page number at the bottom of the page.

⁵ *Id.* ¶ 28, at 9.

⁶ *Id.* ¶¶ 38–45, at 12–15.

with Lunday in the United States where Lunday presumably intends to stay (hence this litigation).[7]

These acknowledged facts raise the specter of whether this is, as a matter of law, a case of children being "wrongfully removed or retained within the meaning of the [Hague] Convention,"[8] given that the Hague Convention on the Civil Aspects of International Child Abduction, as implemented by the International Child Abduction Remedies Act, is aimed at children being retained away from their "habitual residence."[9] The Court thus directed the parties to promptly file briefs addressing this issue, and they have now done so.

In his brief, Pope argues that "this is not a case about wrongful removal of the children *in utero*," but rather a case about "wrongful retention" of the children after birth.[10] In Pope's view, at the moment the children were born, they became "habitual residents" of Brazil because his and Lunday's "last shared intent" was to reside in Brazil and raise the

---

[7] *Id.* ¶¶ 25–26, 44–45, 59, at 8–9, 14–15, 22.

[8] 22 U.S.C. 9003(e)(1)(A) (2012).

[9] Convention on the Civil Aspects of International Child Abduction, pmbl., Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89, 98 ("The States signatory to the present Convention, . . . [d]esiring to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence . . . [h]ave resolved to conclude a Convention to this effect, and have agreed upon the following provisions . . . .").

[10] Pet'r's Mem. of Law (Dkt. 15) at 6. *But see id.* at 13 (where Pope talks in terms of a wrongful removal when he describes Lunday's actions as an "abduction" and as "her deception in sneaking away from the marital home, lying to her husband regarding her intentions, and secreting herself and the unborn children from him until she gave birth and thereafter" and argues that such "unilateral, secretive and deceptive conduct is precisely the type of behavior that the Hague Convention was designed to remedy").

3

children there[11]—a position that he believes renders irrelevant the fact that he and Lunday have been estranged since the children were 19 to 20 weeks *in utero*. Pope's position also assumes that day- (or hour- or minute-) old newborns must have a place of "habitual residence," that this place of habitual residence can be a country in which the newborns have never been physically present, and that his and Lunday's actual respective intents at the time of the children's birth must be overridden by any past agreement he and Lunday had regarding where they would raise their hypothetical, future children. Pope argues that an evidentiary hearing is necessary to establish the existence of this *in utero* agreement between he and Lunday that they would reside in Brazil and raise the children there.[12]

In response, Lunday argues that the children cannot be habitual residents of a country in which they have never been physically present,[13] that she and Pope have no agreement regarding where the children will reside,[14] and that even if any agreement was reached when the children were *in utero*, such an agreement is not sufficient to establish the habitual residency of the subsequently-born children.[15] Lunday argues that this case can be resolved without an evidentiary hearing.[16]

After considering the arguments made in the briefs, the Court is convinced that this is not a case of children being "wrongfully removed or retained within the meaning of the

---

[11] *Id.* at 6, 12, 18.

[12] *Id.* at 12.

[13] Resp't's Resp. (Dkt. 16) at 2, 8–11.

[14] *Id.* at 3, 12, 14.

[15] *Id.* at 6–8.

[16] *Id.* at 2, 16.

[Hague] Convention," but rather a custody dispute that ought to be decided by a court with jurisdiction over such matters.[17] An evidentiary hearing is not necessary because the Court reaches this conclusion based solely on the facts alleged in the petition, and taking as true Pope's contention that he and Lunday had an *in utero*, pre-estrangement agreement that they would reside in Brazil with their future children. For the reasons set forth below, Pope's petition is accordingly denied.

*Analysis*

The International Child Abduction Remedies Act implements the Hague Convention on the Civil Aspects of International Child Abduction,[18] to which both the United States and Brazil are signatories.[19] The Hague Convention requires that any child "wrongfully removed or retained" from his or her country of "habitual residence" be returned to that country for a custody determination.[20] Consequently, determining a child's

---

[17] At the December 5th hearing, the parties informed the Court that Pope had initiated custody proceedings in a Brazilian court, while Lunday had initiated custody proceedings in an Oklahoma state court. Whether the Oklahoma state court has initial jurisdiction, exclusive and continuing jurisdiction, jurisdiction to modify, or temporary emergency jurisdiction to issue orders regarding child custody can be determined by that court in keeping with the Uniform Child Custody Jurisdiction and Enforcement Act, Okla. Stat. tit. 43, §§ 551-101 to 551-402 (2011). *See, e.g.*, *Lin Shu-Hsin v. Virgin*, No. 117,692, slip op. (Okla. Feb. 12, 2019) (applying the act in the context of an international custody dispute where custody cases had been filed in both Taiwan and Cleveland County, Oklahoma).

[18] 22 U.S.C. § 9001(b)(1) (2012).

[19] Status Table, Hague Conf./Conférence de la Haye, https://www.hcch.net/en/instruments/conventions/status-table/?cid=24 (last visited Dec. 20, 2019) (showing that Brazil acceded to the treaty on October 19, 1999, and that the United States of America ratified the treaty on April 29, 1988).

[20] Convention on the Civil Aspects of International Child Abduction, supra note 9, pmbl. & arts. 12, 16, 1343 U.N.T.S. at 98, 100–101.

"habitual residence" is the fundamental issue in a case like this. The answer controls whether the Convention applies and whether it requires the children to be sent to Brazil for a custody determination.

"Habitual residence" is not defined by the Hague Convention,[21] but the Convention does explain that removal or retention of a child is only "wrongful" when it breaches rights of custody "under the law of the State in which the child was habitually resident immediately before the removal or retention."[22] Thus, at the outset, the Convention's text establishes that it provides relief only to a petitioning parent whose child has *some* place of habitual residence, and moreover, a place of habitual residence that was established *prior to* the removal or retention of the child. The very object of the Convention, after all, is "to secure the prompt *return* of children wrongfully removed to or retained in" a country other than their country of habitual residence,[23] and a child can hardly be "returned" to a place the child has never been. Thus, while the term "habitual residence" is not defined by the Convention, the Convention's text does provide valuable context as to the intended application of the term.

---

[21] *Watts v. Watts*, 935 F.3d 1138, 1144 (10th Cir. 2019) (citing *Kanth v. Kanth*, 232 F.3d 901 (10th Cir. 2000) (unpublished table decision)) (explaining that "habitual residency" is undefined by the Convention and ICARA); *Pfeiffer v. Bachotet*, 913 F.3d 1018, 1023 (11th Cir. 2019) (same); *Neergaard-Colon v. Neergaard*, 752 F.3d 526, 530 (1st Cir. 2014) (same).

[22] Convention on the Civil Aspects of International Child Abduction, *supra* note 9, art. 3(a), 1343 U.N.T.S. at 98.

[23] Convention on the Civil Aspects of International Child Abduction, *supra* note 9, art. 1, 1343 U.N.T.S. at 98 (emphasis added).

Turning to the meaning of "habitual residence," because the term is undefined,[24] the Court looks to the words' plain meaning,[25] because "treaties are contracts between independent nations, [thus] their words are to be taken in their ordinary meaning."[26] "Habitual" means customary or usual; and "residence" means presence at a place of abode.[27] The Convention therefore requires identification of the place that the child customarily or usually lived prior to his or her abduction. Because Pope claims that the children were wrongfully retained at the moment of birth, the question is thus: Where did the children regularly or usually live just prior to their birth? The answer, in the ordinary sense, is . . . in their mother's womb, which illustrates the first of many problems with Pope's position.[28]

---

[24] *See supra* note 21.

[25] *See supra* note 23 and accompanying text.

[26] *Santovincenzo v. Egan*, 284 U.S. 30, 40 (1931); *see also Watts*, 935 F.3d at 1144 (citing *Kanth*, 232 F.3d 901 (unpublished table decision)) (stating that the term "habitual residence" "should not be interpreted technically or restrictively").

[27] The ordinary meaning of "habitual" is "[c]ustomary" or "usual." *Black's Law Dictionary* 640 (5th ed. 1979); *see also* 6 *Oxford English Dictionary* 996 (2d ed. 1989) ("existing as a settled practice or condition; constantly repeated or continued; customary"); *Webster's Third New International Dictionary* 1017 (1976) (similar). And the ordinary meaning of "residence" is "[p]ersonal presence at some place of abode," Black's Law Dictionary, *supra*, at 1176, or "one's usual dwelling-place or abode," 13 Oxford English Dictionary, *supra*, at 707, or "the act or fact of abiding or dwelling in a place for some time," *Webster's Third New International Dictionary*, *supra*, at 1931.

[28] *See* Matti Savolainen, *The Hague Convention on Child Abduction of 1980 and Its Implementation in Finland*, 66 Nordic J. of Int'l L. 101, 150–153, 166 (1997) (discussing cases in which an application for return was rejected on the grounds that an unborn child was not habitually resident in any state).

Seemingly recognizing the problem, Pope does not claim that the children were habitual residents of Brazil prior to their moment of birth; he in fact specifically disavows that position.[29] Pope instead argues that the establishment of habitual residency in Brazil and the wrongful retention away from Brazil occurred simultaneously, at the moment of birth.[30] Pope offers no on-point authority for this position, and it appears none exists. And as explained above, this position cannot be squared with the text of the Convention, which explains that a child cannot be wrongfully "retained" away from a place unless they were first a habitual resident of that place.

In fact, by limiting its application to cases involving retention of a child away from the child's place of *habitual* residence, and by framing the relevant question as what was the child's place of habitual residence immediately before the wrongful retention, the Convention's text indicates that it does not apply to all child-custody disputes with an international element. Rather, it applies to cases where a child is being retained away from the country in which they have assimilated and developed ties that have been broken by the removal.[31] Thus, not every crossing of a border with a child is "wrongful" under the

---

[29] Pet'r's Mem. of Law (Dkt. 15) at 6 ("It is not a case about wrongful removal of the children *in utero*.").

[30] *Id.* at 6, 8–9.

[31] *E.g.*, *Feder v. Evans-Feder*, 63 F.3d 217, 224 (3d Cir. 1995) ("Guided by the aims and spirit of the Convention . . . , we believe that a child's habitual residence is the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective."); *Jackson v. Graczyk*, 2007 ONCA 388, ¶ 36, 86 O.R. 3d 183, 192 (Ont. Ct. App.) ("The purpose of the habitual residence requirement under the Convention is to ensure that children have some connection—'some strong and readily perceptible link'—to the jurisdiction to which they

Convention. Only removals or retentions of a child away from the place of *habitual* residence are "wrongful,"—i.e., it is the unilateral severing of established ties to the country that makes the removal or retention "wrongful." For these reasons, the Court is not convinced that a newborn is capable, at the moment of birth, of having a place of "habitual residence," as that term is used in the Convention.[32] To conclude otherwise would be to render "habitual" meaningless.

But even if a newborn can—or must—be assigned a place of habitual residence, there is no sense in which these children could be considered habitual residents of Brazil. It is undisputed that they were born in the United States to parents who are United States citizens, that they are themselves United States citizens, and that they haven't spent a

---

are being returned." (quoting Paul R. Beaumont & Peter E. McEleavy, *The Hague Convention on International Child Abduction* 101 (1999))).

[32]*See In re A.L.C.*, 607 F. App'x 658, 662 (9th Cir. 2015) ("When a child is born under a cloud of disagreement between parents over the child's habitual residence, and a child remains of a tender age in which contacts outside the immediate home cannot practically develop into deep-rooted ties, a child remains without a habitual residence because 'if an attachment to a State does not exist, it should hardly be invented.'" (quoting *Holder v. Holder*, 392 F.3d 1009, 1015 (9th Cir. 2004); Beaumont & McEleavy, *supra* note 31, at 89, 112)); *Delvoye v. Lee*, 329 F.3d 330, 333 (3d Cir. 2003) (Where conflict regarding intent to reside is "contemporaneous with the birth of the child, no habitual residence may ever come into existence."); *W & B v. H (Child Abduction: Surrogacy)*, [2002] 1 FLR 1008, ¶ 25 (finding children had no habitual residence); *Jackson*, 2007 ONCA 388, 86 O.R. 3d 183 (Ont. Ct. App.) (holding the Convention inapplicable where a child lacks a habitual residence because it has no "readily perceptible link" to any jurisdiction); *Mercredi v. Chaffe*, No. C-497/10 PPU, [2009] E.C.R. I-14309, ¶¶ 10, 57 (E.C.J.) (discussing a European Council regulation that specifies which nation's court will have jurisdiction "[w]here a child's habitual residence cannot be established"); *Proceedings brought by A*, No. C-523/07, [2009] E.C.R. I-2805, ¶ 43 (E.C.J.) ("[I]t is conceivable that at the end of this assessment it is impossible to establish the Member State in which the child has his habitual residence.").

moment of their lives in Brazil, much less enough time that Brazil could be considered the place they usually reside.[33]

In arguing otherwise, Pope relies on cases that—recognizing the plain meaning problem—have attempted to nonetheless assign a place of habitual residence to infants based on the parents' actions. Specifically, these cases look to whether there was "shared parental intent" with respect to where the child will reside. But the problem with attempting to apply the "shared parental intent" construct to the facts of this case is that here—even granting Pope's factual allegations every benefit of the doubt—there was never shared parental intent with respect to the children because the children did not yet exist at the time of the alleged agreement; they were 19 to 20 weeks *in utero*. Pope, in fact, does not allege he and Lunday have ever during the lifetime of the children agreed on place of residency for the children—a reality underscored by the very fact of this litigation. Thus, even taking

---

[33] To be sure, there is some authority for the proposition that a child can be a habitual resident of a country where the child has never been, like when a child is born while the parents are vacationing away from their country of residence, *see, e.g., Delvoye v. Lee*, 224 F. Supp. 2d 843, 851 (D.N.J. 2002), *aff'd*, 329 F.3d 330 (3d Cir. 2003) ("[I]f a couple lives in the United States and gives birth to a child during a summer visit to a vacation home in the Swiss Alps, the habitual residence of the child is not Switzerland."), but such situations are exceptions to the normal requirement of some physical presence in the country. *See, e.g., Feder v. Evans-Feder*, 63 F.3d 217, 224 (3d Cir. 1995); *OL v. PQ*, No. C-111/17 PPU, [2017] ECLI:EU:C:2017:375, ¶ 61 (E.C.J.) ("[A] prerequisite of habitual residence in a given Member State is that the child should at least have been present in that Member State . . . ."); *Re F (Abduction: Unborn Child)* [2006] EWHC (Fam) 2199, ¶ 12 ("Whilst one can never say that physical absence can never permit a finding of habitual residence, the usual approach on the facts is to look for some physical presence and there is none here. My conclusion is that Dr F [i.e., the father] simply cannot establish that at 3 October 2003 J [i.e., the child] was habitually resident in England and Wales.").

Pope's claim of an *in utero* agreement at face value, such an agreement differs from the agreement relied on in the cases he cites. Those cases involved agreements with regard to actual, existing children, not agreements regarding children that may or may not be born in the future.[34][35]

Pope's attempt to extend the concept of "last shared parental intent" to a case like this is problematic for several reasons. First, it renders an agreement as to where to raise a child irrevocable unless superseded by a new agreement. That is, in Pope's view, Lunday can never withdraw from the pre-birth agreement she allegedly had with Pope; she is bound to that agreement forever unless she comes to a new agreement with Pope. Taken to its logical end, this position would mean, for example, that an American man and a woman living in France could date and agree that they would raise their future children in France. That man and woman could break up and go their separate ways, with the woman returning to the United States. But if at any time in the future—even a decade later—that man visits the United States and rekindles the romance and that woman becomes pregnant by him,

---

[34] Even the case that Pope claims is "most closely on point to the facts in this case," Pet'r's Reply (Dkt. 19) at 5, a French case styled Cour de cassation [Cass.] [supreme court for judicial matters] 1e civ., Oct. 26, 2011, Nathalie X v. Jamie Y, No. 10-19.905, 1015 (Fr.) (involving an American woman who gave birth while in France visiting her father), also involved an older sibling, such that there was at least shared parental intent with respect to *a* child, even if the other child was *in utero* when that agreement last existed.

[35] Another problem with Pope's position regarding this purportedly irrevocable-by-the-mother agreement is that under American law, Lunday could have unilaterally terminated her pregnancy. In other words, Pope's position does not square with the current state of American law regarding a woman's reproductive rights.

she would be bound to her long-ago agreement to raise any children in France. That can't be right.

Second, Pope's position ignores everything that has happened since the alleged *in utero* agreement. It is undisputed that after leaving Brazil for the United States, Lunday ended her relationship with Pope,[36] remained in the United States,[37] and intends to remain in the United States.[38] Pope acknowledges that for the entire lives of the children, he and Lunday have been in conflict with respect to the children and have never during the children's short lifetimes agreed on a place of residency. Again, this disagreement is why Pope filed this federal case. Plainly, no agreement with respect to where to raise these children exists. As such, "shared parental intent" that existed at 19 to 20 weeks *in utero* is not sufficient to override every other undisputed fact in this case, all of which point in one direction: away from Brazil as the place of habitual residence.

Lastly, while Pope describes this case as "an invitation for forum shopping at its worst,"[39] let us be clear what denial of this petition will mean for him and Lunday. They, two United States citizens, will litigate custody of their United States citizen children—children who never spent a moment of their lives anywhere but the United States—in a court in the United States that may well ultimately decide that jurisdiction lies in Brazil.[40]

---

[36] Pet'r's Mem. of Law (Dkt. 15) at 9–10, 14–15; Resp't's Resp. (Dkt. 16) at 12.

[37] Pet'r's Mem. of Law (Dkt. 15) at 14–15; Resp't's Resp. (Dkt. 16) at 12.

[38] Pet'r's Mem. of Law (Dkt. 15) at 14–15; Resp't's Resp. (Dkt. 16) at 12.

[39] Pet'r's Reply (Dkt. 19) at 6.

[40] *See supra* note 17.

The petition is accordingly **DENIED.** The Agreed Temporary Restraining Order (Dkt. 12) is vacated, and judgment is entered against the Petitioner and in favor of the Respondent.

**IT IS SO ORDERED this 23rd day of December, 2019.**

PATRICK R. WYRICK
UNITED STATES DISTRICT JUDGE